IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.   Criminal No.: 3:18CR00075

VIOREL ANTOANEL NABOIU,   Defendant

### POSITION ON SENTENCING AND REQUEST FOR NON-GUIDELINE SENTENCE

Comes now the defendant, Viorel Antoanel Naboiu (hereinafter "Naboiu"), by counsel, and advises that while the Probation Officer has correctly calculated the guideline range to be 41-51 months under Count One, with two years consecutive to Count One under Count Ten, based on an adjusted offense level of 22, and a criminal history category of I, the defendant should be sentenced based on a adjusted offense level of 20 (range 33-41) based on the analysis and arguments herein.

### DISCUSSION AND ANALYSIS

**I. The Advisory Guideline Range is Not to be Presumed Reasonable**

The Supreme Court stated in no uncertain terms that the United States Sentencing Commission's Guidelines ("Guidelines") cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors spelled out in 18 U.S.C. Section 3553(a). Nelson v. United States, 129 S. Ct. 890 (2009) (*per curiam*); Spears v. United States, 129 S.Ct. 840 (2009) (*per curiam*). The Court's decision in Nelson and Spears built upon its earlier decisions in Kimbrough v. United States, 128 S.Ct.558(2007), and Gall v. United States, 128S.Ct.586 (2007), establishing the Guidelines as simply an advisory tool to be considered alongside the other 18 U.S.C. Section 3553(a) statutory considerations. "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in Nelson, 129 S.Ct. At 892, and "[t]he

1

Guidelines are not only *not mandatory* on sentencing court; they are also not to be *presumed* reasonable. " *Id*. (Emphasis in original).

Although sentencing courts must continue to consider the Guidelines, Congress has *required* federal courts to impose the least amount of imprisonment necessary to account for the considerations and accomplish the sentencing purposes set forth in 18 U.S.C. 3553(a). These include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory Guidelines range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. Section 3553(a).

Although a district court must begin its analysis by correctly calculating the advisory sentencing range, the sentencing court is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence. This is because, under Rita v. United States, 127 S.Ct.2456, 2465 (2008), a district court is free simply to disagree, based on the 18 U.S.C. Section 3553(a) sentencing factors, with the Guidelines "rough approximation" of the appropriate sentence for any given case. *Id*.

## II.   FACTORS UNDER 18. U.S.C. Section 3553

### a. Nature and Circumstances of the Offense

The nature of the offense is generally set forth in the "Offense Conduct" incorporated into the Presentence Report ("PSR"). See PSR, para. 25. The defendant admitted his criminal conduct. The defendant has demonstrated acceptance of personal responsibility. Further

2

explanation, however, is required for purposes of one of the sentencing arguments advanced herein.

Specifically, the Indictment charges that beginning "sometime prior to January 21, 2018", the exact date being unknown, and May 5, 2018, Naboiu along with co-defendant, Florin Bersanu, participated in a skimming conspiracy that covered Virginia, West Virginia, and Florida. As the investigation has evolved, the timing of Bersanu and Naboiu conspiracy has been particularized. For example, it is believed that Bersanu and Naboiu put their conspiracy in motion around January 1 of 2018, began overt acts in furtherance of the scheme over the next three weeks, and started actual skimming operations around January 21, 2018. Accordingly, while the Indictment includes broad language that the conspiracy between Bersanu and Naboiu began "sometime prior" to January 21, 2018, the dates have been narrowed, and the United States is aware generally of the dates surrounding the Naboiu/Bersanu conspiracy. For purposes of this argument, it is only important to assert that the Nabiou/Bersanu conspiracy did <u>not</u> exist between November 19, 2017 and December 3, 2017.

The Naboiu/Bersanu fact pattern then served as the basis for the Statement of Facts to which Naboiu plead guilty as noted in paragraph 25 of the Presentence Report. Bersanu also plead guilty based on the same general Statement of Facts. In the Statement of Facts, Naboiu admitted to installation and/or use of skimming devices generally beginning January 21, 2018 and continuing to May 5, 2018. During that window, a total of 730 accounts were skimmed, either successfully, or unsuccessfully. See PSR, para. 25(4). The loss associated with the skimming activity in the Naboui/Bersanu conspiracy, whether intended or actual, created a total loss under the adopted Statement of Facts of $423,450.35.

As the court recalls, Bersanu has already been sentenced. In Bersanu's sentencing, the loss of approximately $423,450 created a 12 level enhancement to the base offense level of 7 for fraud

under USSG 2B1.1(a). After other enhancements and theacceptance of responsibiilty credit, an adjusted offense level of 20 was established for Bersanu, creating a range of 33-41 months on the fraud count. The court then sentenced Bersanu to 33 months on the fraud count, and added the mandatory consecutive two year term for identity theft, creating a total sentence of 57 months.

For all purposes, the criminal conduct, ciminal record, culpability and general backgrounds of Bersanu and Nabiou are equal when evaluated for the Nabiou/Bersanu conspiracy. Having said that, Naboiu's sentencing calculations provide for a total loss of $796,819.35 versus $423,450.35. The higher loss figure provides for a enhancement of 14 under 2B1.1(b) insofar as the loss figure is greater than $550,000. The resulting adjustment increased Naboiu's adjusted offense level by two levels to 22, with an ultimate resulting range of 41-51 months, followed by 24 consecutive months for the identity theft. The genesis of the increase applicable to Naboiu, but not Bersanu, derived from the first three entries on the loss spreadsheet set forth in the Presentence Report above paragraph 54. See PSR, para. 54. These three entries all involved the same victim, BB&T. The three entries make reference to criminal activity at 2 Arnold Road, Arnold, Maryland, 2015 West Street, Annapolis, Maryland, and 2078 General Highway, Annapolis, Maryland,(hereinafter the "Maryland Conduct") The dates of the Maryland Conduct extend between November 19, 2017 and December 3, 2017. During that two week window of skimming activity, 631 accounts were collected by a skimming device, with an actual loss component for those 631 accounts of $100,369.00 to BB&T.. The intended loss component under the Maryland Conduct totalled $273,000. After adding the Maryland Conduct (actual and intended) and the Indictment conduct, (actual and intended) , the total loss for Nabiou was incureasedd to $796,819 See PSR, para 58. That being the case, the Maryland Conduct imposed an additional approximate $373,370 in loss attributable to Nabiou, that was not attributed to Bersanu. The increased actual loss attributable to

the Maryland Conduct is also the basis for the increased restitution figure from $49,875 under the Plea to $150,244 under the PSR. See PSR, para. 62-63.

To investigate the disparity treatment, defense counsel requested a continuance of the sentencing previously scheduled to determine whether the Maryland Conduct justified the increase in the loss amount and resulting base offense level. Investigation reveals the following basic information which should be confirmed by the United States if questioned.

Specifically, Naboiu entered the United States illegally through Canada on the premises that a contact in America would be able to find him a job in the trucking business. That job did not materialize. Through his friends, he was eventually steered to someone who, among other things, was also involved in skimming in the Annapolis area. At the time, this individual was unknown to Naboiu, and Nabiou did not enter the United States to conduct any scheme with this specific individual. Additionally, the individual with whom Nabiou connected was unknown to Bersanu. Accordingly, the relationship between Naboiu and his handler for the Maryland Conduct was entirely different and entirely separate from his connection to Bersanu, who he saw in early January, but who was previously known to Nabiou from Romania. During the Maryland Conduct, Naboiu's role was limited to that of being simply a runner, or someone who would simply install the device provided to him, then go back and retrieve the device at a later date. Naboiu was accompanied on all three known dates by an unidentified subject. Naboiu did not obtain, build, or provide the skimming equipment used in the Maryland Conduct. Naboui had little participation in the Maryland Conduct other than being told what to do. Naboiu received very little money as a result of the Maryland Conduct and was not allowed to participate in the division of illegal proceeds. The money that Naboiu did receive was really just an undetermined amount of cash for his limited role of retrieving the information and passing the information along to his handler. In

5

early to mid-December, Naboiu actually terminated his involvement in the Maryland conspiarcy. Eventually Nabou encountered Bersanu and the Naboiu/Bersanu conspiracy took specific shape in early January, 2018.

Defense counsel had intended to advance an objection and argument asserting that the Maryland Conduct should be excluded in its entirety from the sentencing calculus because the Maryland Conduct in November, 2017 was not directly part of the charged conspiracy beginning January, 2018, and therefore also not in furtherance of the charged conspiracy. The argument was that the Maryland Conduct was totally independent from the Naboiu/Bersanu conspiracy, therefore not direct conduct or relevant conduct. Factually, Nabiou maintains that it is still accurate to assert that the conspiracies were different and distinct.

Upon review of the case law, however, and conferring with the Probation Officer and U.S. Attorney, it appears that the Maryland Conduct would fall under United States Sentencing Guideline 1B1.3(a)(2), regardless of whether unrelated and/or uncharged as part of the instant conspiracy. Nabiou's Maryland Conduct would be considered as the "same course of conduct" as the charged consiracy. Defense counsel would have to concede that Maryland Conduct involved skimming of accounts using ATM's, used the same basic techology, it involved the same victim, BB&T, and was temporally proximate (30 days) to the Naboiu/Bersanu conspiracy. Accordingly, defense counsel instead argues that the defendant's <u>role</u> in the Maryland Conduct was so minor that it should not account for an additional two levels in the Naboiu/Bersanu conspiracy as charged. The defendant's role is a factor that can be condidered in evaluating course of conduct. <u>United States v. Mullins</u> 971 F.2d 1138 (4th Cir. 1992). That being the case, it should also be a factor worthy of consideration for sentencing.

Defense counsel is also not suggesting that the Maryland Conduct has to be ingnored. It certainly does not make Nabiou a better person. Defense counsel is also not suggesting that Nabiou did not participate in the Maryland Conduct. Nabiou has admitted the conduct. In essence, however, Naboiu's offense level in this case was adjusted upwardly two levels for the Maryland Conduct based on the addition of 630 skimmed accounts and $373,370 in actual or intended loss, when Naboiu did not participate as a principal, did not obtain any real benefit, did not produce or obtain the skimming equipment, and was essentially just a runner for his handler over a two week period between November 19, 2017 and December 3, 2017, for someone he did not know.

The court should consider at least a one level downward variance to account for Nabiou's role in the Maryland conduct. If the case, a one level decrease would result at level 21, Category I range of 37-46 months.

    b. **Characteristics of the Defendant**

The defendant is in the United States illegally. Accordingly, Nabiou is an alien subject to deportation immediately upon the conclusion of his sentence. Based on that status, Nabiou will not be eligible for any reduction in security rating, will not be eligible for certain vocational rehabilitation benefits, and will not be eligible for any home confinement program. In today's climate, whether through the Sentencing Commission or Congress, the tendency appears to be to provide alternative to incarceration, when appropriate, especially for defendants who are not violent and not drug distributors, like Nabiou. Nabiou's status will not allow him the benefit of any of these recent trends. Additionally, Nabiou will have to remain incarcerated through his deportation hearings. In essence, Nabiou's sentence will be more severe than someone similarly situated that is not an illegal alien. These factors can be considered by the court at sentencing.

United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994). An appropriate consideration would be a one level decrease which, in addition, to the prior argument for a one level decrease, would yield a total of a two level decrease. This would create an adjusted level of 20, Category I, or 33-41 months.

Personal to the defendant, Naboiu was born in Romania and is the oldest of two children born to his parents. Naboiu grew up under communist rule (Socialist Republic of Romania), and described that the community party provided housing, food, employment, etc., and it was always just enough. See PSR, para. 90. After graduating from high school in 1993, Naboiu entered the Romania Army (from 94-96) under mandatory conscription and was trained as a morse code operator. Naboiu attained the rank of Sergeant. See PSR, para. 91. Following his military service, he immigrated to Rome, Italy in about 1997 to find work. See PSR, para. 92. While living in Rome, Nanboiu worked construction and met his wife. They were married for six years. After his divorce and economic crisis in Italy, Naboiu immigrated to Germany. See PSR, para. 93.

In early 2014, the defendant came to the United States legally and settled in Houston, Texas and worked in construction until June of 2015. Naboiu then returned to his hometown in Romania where he became a manager of an import/export business. See PSR, para. 94. Naboui returned illegally to the United States in November, 2017 to find work. . The defendant has no criminal record. Nabiuos appears genuinely remorseful for his conduct and has become tearful on several occassions based on his personal embarassment and the embarassment he has caused him family in Romania to suffer.

Mr. Naboiu is divorced and has no children. See PSR, para. 100. Naboiu is currently engaged and his fiance lives in Romania. See PSR., para. 102. Naboiu indicates that he has a herniated disc with occasional radiating paid down his left leg and foot and states that he rqeuries

8

surgery. See PSR., para 104. Naboiu advised has no history of chronic medical conditions, or illnesses and is not currently taking any prescribed medications. See PSR, para. 105. The defendant denies any history of psychological problems. See PSR, para. 61.

From a substance abuse standpoint, the defendant has no history of alcohol or illegal drug use. See PSR, para. 107.

### b. The kind of sentences available.

The only sentence available to the defendant is incarceration. The defendant has been incarcerated since May 5, 2018, his arrest date in Florida, for this charged criminal conduct and should be given credit for time served from that date..

### c. The advisory guideline range

Your defendant agrees that the guideline range has been calculated based on relevant conduct to create a level 22, with a criminal history category of I, creating the range of 41-51 months under Count One with two years under Count Ten which must run consecutively. Based on the arguments raised, however, your defendant asserts that he should be sentenced at a level 20, Category I, or 33-41 months on the fraud count. That sentence must be followed by a two year consecutive sentence on the identity theft count.

### d. Disparity

Disparity was addressed at length supra and the disparity argument, which is relevant, is adopted herein. At the end of the day, Bersanu and Nabiou should be sentenced equally.

### e. Restitution

Restitution is mandatory. The figure agreed to by Nabiou in the Statement of Facts (49,875.15) is different based on the Maryland Conduct outlined herein. If included, the restitution figure increases to $150,244.15 per PSR 20. Whether the restitution figure is based on the charged

conduct versus the charged conduct and the Maryland conduct requires determination.

### f. A promotion of respect

A sentence in the range of fifty seven total months under Count One and Count Ten, reflects the seriousness of the office and provides respect for the law. Mr Naboiu is the type of defendant that will receive little benefit from simply being housed in prison for a time which is greater than necessary to provide adequate punishment.

## CONCLUSION

At the end of the day, Viorel Antoanel Naboiu grew up in a Communist regime where he relied on his government for work, food and housing. When the regime ended, Nabiou, like many others from Romania and Eastern Europe, found ways to infiltrate the United States marketplace to make what they saw as easy money. Based on past representation of other similar defendants, the perpetrators at Nabiou's level do not realize the severity of the crimes, the impact of their actions on the victims, or the punishment they could face when caught. Now that Nabiou has been faced with reality, he does not impress counsel as someone likely to re-offend. A sentence of 57 months total accomplishes the goals necessary for this defendant's sentence.

Respectfully Submitted,
Viorel Antoanel Naboiu

By: /s/ _____

Charles A. Gavin, Esquire
Virginia State Bar #: 31391
Attorney for Viorel Antoanel Naboiu
Cawthorn, Deskevich & Gavin, P.C.
1409 Eastridge Road
Richmond, VA 23229
(804)288-7999
(804)285-9015 *facsimile*
E-Mail: c.gavin@cawthorn.net

**CERTIFICATE OF SERVICE**

I hereby certify that this 8th day of January, 2019, I will electronically file the foregoing the Clerk of the Court using the CM/ECT system which will then send a notification of such filing (NFE) to Brian Hood, Assistant United States Attorney, and to David Simon, U.S. Probation Officer.

By:_____/s/_____
Charles A. Gavin, Esquire
Virginia State Bar #: 31391
Attorney for Viorel Antoanel Naboiu
Cawthorn, Deskevich & Gavin, P.C.
1409 Eastridge Road
Richmond, VA 23229
(804)288-7999
(804)285-9015 *facsimile*
E-Mail: c.gavin@cawthorn.net